Wright H. **HUNTLEY**

v.

**The UNITED STATES.**

No. Congressional 2–53.

United States Court of Claims.
Nov. 8, 1955.

Willis Smith, Bishop, Cal., for plaintiff.

Walter Kiechel, Jr., Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

This is a Congressional reference case. In June 1953, the House of Representatives, 83d Congress, 1st Session, adopted House Resolution 255, and transmitted a copy thereof, together with a copy of bill H. R. 1114 and a copy of House Report No. 541, to this court for action pursuant to sections 1492 and 2509 of Title 28 United States Code.[1]

H. R. 1114 provides for the granting of relief to one Wright H. Huntley, the plaintiff in these proceedings, for alleged loss of profits suffered by him because of the establishment of an aerial gunnery range by the United States in the vicinity of his talc mine, which he asserted interferred with and prevented his operation of the mine.

The issues to be determined by this court are whether the plaintiff has a legal or equitable claim against the United States, and the amount of damages, if any, which the plaintiff is entitled to recover.

From a careful consideration of the record in the case it is the opinion of this court that the plaintiff has an equitable claim against the United States and is entitled to compensation in the amount of $20,147.27 for loss of profits by reason of the causes mentioned in H.

R. 1114, and it is recommended that he be paid that amount.

The plaintiff, a resident of the State of California during the period of time pertinent to his claim, was engaged in the mining business. On July 12, 1941, he became lessee of the White Eagle Talc Mine, situated on the east side of the Inyo Range, one mile from the mouth of Willow Creek, in Inyo County, California. The lease covered the mine and mining property, together with appurtenances, including all water and timber rights for mining domestic uses. The plaintiff, as lessee, agreed to pay the lessor 50 cents per ton for all talc taken from the property, and agreed to pay a minimum of $50 royalty a month. The lease was to continue in effect until forfeited by violation of its covenants.

Funds were advanced to the plaintiff by the Sierra Talc Company for the initial development of the White Eagle Talc Mine. Plaintiff put in the necessary trails and equipment, including an aerial tramway to ore bunkers, trestles or chutes, and also improved the mining camp with additional buildings and water lines. In 1941, plaintiff commenced open-pit surface mining operations and began selling talc.

The talc produced at the White Eagle Talc Mine was hauled out of the Saline Valley by motor trucks. At times, the plaintiff used his own trucks, and at other times he used contract truckers. The south road out of the valley, completed in April 1943, leads to the town of Keeler, a distance of approximately 75 miles from the mine camp, and to the Keeler

---

1. Section 1492 of Title 28 reads as follows: "The Court of Claims shall have jurisdiction to report to either House of Congress on any bill referred to the court by such House, except a bill for a pension, and to render judgment if the claim against the United States represented by the referred bill is one over which the court has jurisdiction under other Acts of Congress."

Section 2509 of Title 28 reads as follows: "Whenever any bill, except for a pension, is referred to the Court of Claims by either House of Congress, such court shall proceed with the same in ac-

cordance with its rules and report to such House, the facts in the case, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy.

"The court shall also report conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant."

spur of the Southern Pacific Railroad. The north road out of the valley leads to the town of Zurich near Bigpine, California. A talc mill was located at Zurich, and also a spur of the Southern Pacific Railroad, Zurich being a distance of approximately 40 miles from the mine camp. Both the south road and the north road were normally in poor condition due to little or no maintenance, and also due to washouts, slides and snow in the mountain passes, and to heavy trucking.

The plaintiff knew as early as May 10, 1944, that the Air Force planned to establish an aerial gunnery range in the Saline Valley which might prevent him from using the south road for trucking talc. The aerial gunnery range comprised some 558,000 acres of land in Saline Valley to which the Government acquired exclusive rights by a condemnation proceeding resulting in an order of immediate possession as to property described in an amended complaint, the order being dated August 2, 1944. The Saline Valley and the aerial gunnery range had never been fully surveyed, and consequently it was not definitely ascertained whether the White Eagle Talc Mine was within or outside the range area.

On June 8, 1944, the plaintiff met with authorized Government representatives in San Francisco at the office of the Division Engineer, War Department. Representatives of the Fourth Air Force, the War Production Board, and the Reconstruction Finance Corporation met with the War Department mining engineer and the plaintiff. The conferees discussed the strategic importance of talc from the White Eagle Talc Mine, and the problem of continued use of the north road out of Saline Valley for the hauling of talc from the plaintiff's mine to mills and railheads out of the valley. The north road was located near the west boundary of the Saline Valley, but some 20 miles of this north road was within the aerial gunnery range area.

The conferees concluded that plaintiff's talc was of a critical nature, and recommended that use of any road leading northerly from the White Eagle Talc Mine be prohibited between the hours of 7:30 a. m. and 4:30 p. m. The plaintiff was thus required to curtail his talc hauling operations to the period between 4:30 p. m. and 7:30 a. m. and to the north road only.

At this conference, the Division Engineer requested the plaintiff to furnish data from which an appraisal of the damages due to curtailed hauling operations could be made. However, a definite promise that damages, compensation, or the like, would be paid was not made by anyone representing the Government, nor was any representative at the conference authorized to make such a promise or commitment.

By a letter dated June 10, 1944, addressed to the U. S. Division Engineer in San Francisco, the plaintiff advised that by reason of the orders of the Government he was limiting the operation of his hauling trucks over roads within the aerial gunnery range to the hours of 4:30 p. m. and 7:30 a. m. each day of the week. Plaintiff enclosed a summary of his mining operations, and requested definite information on what procedure he should follow in filing a claim for ultimate losses and damages.

The plaintiff continued to operate the White Eagle Talc Mine, but limited the hauling operations to the agreed evening and night period from 4:30 p. m. to 7:30 a. m., from June 10, 1944, to about April 1, 1945, a period of approximately 10 months. On or about the latter date the plaintiff was called to Muroc Air Base and was told by the commanding officer, who had full authority to act in the matter of the operation of the gunnery range, that the White Eagle Talc Mine was in the most dangerous part of the aerial gunnery range, and that the plaintiff could not be protected there, and that he would have to leave the mine and cease operation. Plaintiff had miscellaneous equipment taken out of the mining area and abandoned the mine camp by April 1, 1945.

The plaintiff was advised by a communication, dated February 21, 1946, from the War Department Real Estate Division, that the Saline Valley Aerial Gunnery Range would be used no longer as a gunnery range and that no further restrictions as to access or operation of the plaintiff's mining interests in the valley existed. This was approximately 11 months after the plaintiff was ordered to cease operations entirely. However, plaintiff did not resume mining at the White Eagle Talc Mine until late in 1952, at which time Inyo County began repair and maintenance of the access roads. Plaintiff requested and urged improvement of the access roads both before and after the Government's February 1946 notice of removal of restrictions in the Saline Valley.

The White Eagle Talc Mine was not physically damaged by the operation of the aerial gunnery range in Saline Valley. Likewise the mine access roads in Saline Valley were not physically damaged by the operation of the gunnery range. However, the repair and maintenance of the roads was prevented by restrictions resulting from operation of the gunnery range from June 1944, through February 1946, because no access could be had to them.

The restrictions ordered and imposed by defendant on plaintiff's talc hauling operations at night from June 1944, to April 1, 1945 (approximately 10 months), and the restriction of all plaintiff's talc mining and hauling operations from April 1, 1945, to February 21, 1946 (approximately 11 months), caused the plaintiff loss of profits for which he filed claims. However, plaintiff has not been paid on any of the claims he presented to the War Department for compensation for losses caused by the restrictions and prohibitions placed on his talc mining operations.

The first issue to be determined is whether the plaintiff has either a legal or equitable claim against the defendant for his loss of profits caused by the restrictions placed upon his mining operations.

It clearly appears that there was no definite agreement or contract between the plaintiff and defendant regarding damages or compensation for losses resulting from the restrictions imposed by the Government. But in our opinion this was not necessary for plaintiff to recover, for reasons hereinafter stated. The conference of June 8, 1944, which was attended by the plaintiff and representatives of various Government agencies, was called for the dual purpose of ascertaining the critical nature of talc and of arriving at a solution to the road problem that would permit plaintiff to continue his mining operations to a limited extent at least, without interferring with the operations of the aerial gunnery range. This purpose was accomplished. No definite promise that damages, compensation, or the like would be paid was made by any representative of the Government present at the conference, nor was any representative authorized to make such a promise. Therefore, plaintiff has no legal claim arising from the conference proceedings.

Plaintiff contends, however, that the restrictions placed on his mining operations amounted to a taking of his property within the meaning of the Fifth Amendment to the Constitution. The evidence submitted on this point was inconclusive. It was not definitely established whether the mine lay within or without the aerial gunnery range. Furthermore, the evidence did not clearly reveal whether the commanding officer at Muroc Air Base had authority to give plaintiff such orders to cease mining operations and to abandon the property as would constitute a taking, although he did so and plaintiff was compelled to comply.

While a definite promise that damages or compensation would be paid was not made, it appears that plaintiff was led to believe that he would be compensated for losses if he would continue to operate the mine on a restricted basis as directed. It was concluded at the conference of June 8, 1944, that plaintiff's talc was of a critical nature and for that rea-

son plaintiff could reasonably assume that defendant desired him to continue operations. Plaintiff was requested to submit supporting data from which appraisal of damages could be made. Plaintiff submitted reports and made claims, and the defendant's representative had an audit made of plaintiff's books, apparently for the purpose of verifying plaintiff's claims. The record does not reveal that defendant ever gave plaintiff any indication, either before or during the period in which the restrictions were in effect, that he would not be compensated for losses due to curtailment of his operations. On the contrary, it appears that plaintiff was led to believe, and had a reasonable right to believe, that he would be compensated for loss of profits. It is the opinion of the court that the facts clearly establish that an equitable obligation exists on the part of the defendant to compensate the plaintiff. He had no alternative except to obey the defendant's orders. It is well established that Congress has the constitutional power to pay debts which rest only on an equitable or moral obligation. United States v. Realty Company, 163 U.S. 427, 16 S.Ct. 1120, 41 L.Ed. 215. Since, in our opinion, such an obligation exists in the present case, we recommend to Congress, that the plaintiff receive compensation for loss of profits during the period in which the restrictions on his mining operations were in force.

■ Plaintiff contends that he should also receive compensation for loss of profits occurring between the time that the restrictions were lifted in 1946 and the time that mining operations were resumed in 1952. We cannot agree with this contention. Defendant removed all restrictions on February 21, 1946. After that date plaintiff was free to resume full-scale operations. Defendant had done no damage to the roads leading to and from the mine and was under no duty to repair them. Whether the roads were in the same or worse condition is not important. After the defendant removed the restrictions, it was in no way responsible for the plaintiff's delay in resuming normal mining activities. Since the defendant was not responsible for plaintiff's loss of profits after February 21, 1946, plaintiff should not be allowed compensation for losses after that date.

■■ Defendant urges that plaintiff should not be allowed to recover because the amount of profits lost is highly speculative in nature and incapable of accurate determination. We cannot agree with defendant's contention. The law does not require absolute certainty of data upon which lost profits are to be estimated. All that is required is such reasonable certainty that damages may not be based wholly upon speculation, and it is sufficient if there is a certain standard or fixed method by which profits sought to be recovered may be estimated with a fair degree of accuracy. Anvil Mining Company v. Humble, 153 U.S. 540, 14 S.Ct. 876, 38 L.Ed. 814; Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684. In the instant case the plaintiff has clearly proved the loss of profits and the evidence is such that they may be reasonably estimated from records of the operation of plaintiff's business both before the restrictions went into effect and after they were removed and mining resumed. Since this is true plaintiff is entitled to recover such estimated profits.

The final question to be determined is the amount of compensation equitably due from the United States to plaintiff.

For the 6-month period immediately preceding the road use restrictions, the White Eagle Talc Mine had an average production of 277.623 tons per month producing a profit of $1,273.90 per month, or a profit of $4.588 per ton. These averages have been computed from the plaintiff's revised audited schedules.

For the 10-month period in which plaintiff's use of the north road was partially restricted, the White Eagle Talc Mine had an average production of 159.641 tons per month producing a profit

of $48.36 per month, or a profit of $0.302 per ton.

For the 11-month period in which operation of the White Eagle Talc Mine was fully restricted, production and profits were nil. These facts are clearly established.

For the 6-month period starting January 1, 1953, when plaintiff resumed operation of the White Eagle Talc Mine, production averaged 150.636 tons per month. The amount of profits for this period is not indicated. It seems reasonable that it would require some time for plaintiff to get back into normal production. But in any event this does not seem important here.

The operations of the White Eagle Talc Mine may be summarized as follows:

"A. During the 6-month period before restrictions—
Production averaged 277.623 tons per month.
Profits averaged $1,273.90 per month.
Profits averaged $4.588 per ton.

"B. During the 10-month period under hauling restrictions—
Production averaged 159.641 tons per month.
Profits averaged $48.36 per month.
Profits averaged $0.302 per ton.

"C. During the 11-month period under full restrictions—
No production.
No profits.

"D. During the 6-month period when unrestricted operations were resumed—
Production averaged 150.636 tons per month."

It is noted that the monthly average production decreased from 277.623 tons per month before the restrictions went into effect to 150.636 tons per month after production was resumed. The average of these two rates is 214.129 tons per month, and this average is a fair approximation of what the White Eagle Talc Mine might have produced but for the Government restrictions.

The market for talc fluctuates, and did fluctuate in 1944, 1945 and 1946. It is not clear that the plaintiff could have produced and sold as profitably as he claims, 500 tons per month during the period he was restricted by the operation of the Saline Valley Aerial Gunnery Range.

Utilizing the average rate of unrestricted production, i. e., 214.129 tons per month, to compute loss of profits in the partially restricted period, the 10-month production would have been 2,141.29 tons, and utilizing the average profit per ton during unrestricted production, i. e., $4.588 per ton, the 10-month profit would have been $9,824.24. Plaintiff actually made a profit of $483.63 during this 10-month period, so his actual loss of profits was $9,340.61.

Utilizing the same average rates for the 11-month period of full restrictions, production would have been 214.129 times 11, or 2,355.419 tons, and the profit would have been 2,355.419 times $4.588, or $10,806.66.

Adding the losses computed for the two periods, plaintiff's total loss from the White Eagle Talc Mine operation for the period from June 10, 1944, to February 21, 1946, during which period the operations were restricted and prohibited by the Government, amounted to $20,147.27.

Plaintiff objects to the use of the production average for the 6-month period beginning in January 1953. He claims that the production figure was low for that period due to the fact that it was necessary to perform extensive work to reopen and rehabilitate the mine after the long layoff. We think that this objection is not a valid one. The evidence does not reveal that the layoff was the main cause for the repair work done when the mine was reopened. It is quite possible that most of the work would have been necessary regardless of the layoff. Furthermore, since plaintiff was free to resume operations in 1946, it is apparent that the defendant was not responsible for the long layoff. Therefore, we can see no error in the use of the

production figures for the 6-month period beginning in January 1953, for determining plaintiff's loss, since this average and the average for the 6-month period immediately preceding the restrictions give a fair and reasonable estimation of what production might have been while the restrictions were in force.

### Conclusion

It is the opinion of this court that the plaintiff has no legal claim against the defendant based upon a taking or upon any definite contract or agreement concerning compensation made at the conference of June 8, 1944, or at any other time. However, it is the opinion of the court, from the record, that plaintiff has an equitable claim against the defendant since the plaintiff was ordered by authorized agents of the defendant to do what he did and was also led to believe by such officers and agents that he would be compensated for losses, and acted upon this reasonable belief. It is the conclusion of the court that the sum of $20,-147.27 is equitably due from the United States to the plaintiff, and it is therefore recommended to Congress that plaintiff be awarded this amount.

The opinion and the findings of fact, together with the conclusions therein, will be certified to Congress pursuant to House Resolution 255

JONES, Chief Judge, and LARAMORE and MADDEN, Judges, concur.

WHITAKER, Judge (dissenting in part).

I regret I am unable to concur with the other members of the court in the recommendation made in this matter. They recommend payment to plaintiff for loss of anticipated profits during two periods: the first, the period of partially restricted operations; and the second, the period of totally restricted operations.

During the first period plaintiff's operations were restricted only because he was required to haul talc from his mine between the hours of 4:30 p. m. and 7:30 a. m., instead of during the daytime. Such a restriction could hardly account for a drop in profits from $9,-824.24 to $483.63.

This period of restricted operations was from June 1944 to April 1, 1945. The opinion of the majority recognizes that the market for talc fluctuates and did fluctuate in 1944 and 1945 and also in 1946. In finding 27 the court finds:

"It is not clear that the plaintiff could have sold profitably his estimated 500 tons per month during the period he was restricted by the operation of the Saline Valley Aerial Gunnery Range."

In addition to this, the testimony shows that in the latter part of 1944 plaintiff canceled his prior commitments for the sale of talc, and was unable to arrange others. As a result, plaintiff's production was drastically curtailed, reaching a low of 32 tons in February 1945. On March 20, 1945, there was a slide of approximately 3,000 tons of the overburden which blocked the portals to the mine, and prevented further mining until this slide was removed. It was not removed until the mine was reopened in 1953, over six years after restrictions had been removed. Plaintiff's mine was at a remote locality and miners were not readily available.

It would seem, therefore, that other things contributed to the loss of profits and that the restriction placed on plaintiff's hauling operations during the first period by no means accounted for all of the decline in profits from $9,824.24 to the insignificant amount of $483.63.

Although I do not agree with the majority on the extent of the effect of the restrictions on his hauling operations, I do think plaintiff is entitled to recover whatever damages he suffered on account of those restrictions. A part of this road over which plaintiff had to haul his talc was in the limits of the Saline Valley Aerial Gunnery Range and, therefore, plaintiff's right of ingress and egress to his mine was impaired by the establishment of this range, and for this

plaintiff is entitled to compensation as for a taking under the power of eminent domain. Causby v. United States, 60 F. Supp. 751, Id., 104 Ct.Cl. 342, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; Id., 75 F.Supp. 768, 109 Ct.Cl. 768.

The amount to which plaintiff is entitled for this taking is extremely difficult to determine, but I feel quite sure that this restriction on his hauling operations did not result in the entire decline in his profits. I would allow plaintiff between 10 and 20 percent of the decline in anticipated profits as compensation for this taking. This would be, roughly, $1,000 to $2,000 for the first period.

In my opinion plaintiff is entitled to approximately the same amount for the next period, because he is entitled to compensation during this period only because his right of ingress and egress was impaired. He is not entitled to recover because the commanding officer of the gunnery range told the plaintiff to vacate the mine premises. This officer had no authority whatever to tell plaintiff to do this. The mine was not located in the gunnery range. The limit of the authority of this officer was to keep people out of the gunnery range. He had absolutely no authority to drive people off of their property if it lay without the gunnery range.

It is axiomatic that the Government is liable for the taking of property only if it is taken by an authorized agent. The Government has not and could not possibly subject itself to liability for the acts of unauthorized agents in the multitudinous operations of our Federal Government. Hundreds of thousands of agents are employed. If the Government subjected itself to liability for the acts of all of these agents, whether they were authorized to act or not, it would soon run into bankruptcy.

Had this plaintiff brought his suit in this court under our general jurisdictional act, seeking compensation for the taking of his property on account of this action of the commander of the gunnery range, we would have dismissed his suit,

of course. What the majority opinion of this court has done is to recommend to Congress that this plaintiff be paid for an act for which no other citizen of the country would have been entitled to recover. I am quite sure that Congress does not want to prefer this plaintiff over citizens generally.

For these reasons I think that Congress should award to this plaintiff only such damages as it thinks were the result of the restricted hauling operations to which he was subjected by reason of the fact that the road to his mine ran in part through this gunnery range.

I would limit the amount to be paid plaintiff to not more than $4,000 at the most.

United States Court of Claims, Nov. 8, 1955.

