**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4153-16T4

MICHAEL BARTOLF, ROBERT &
CHARLOTTE BARTOLF, and
WILLIAM & LESLIE BARTOLF,

      Plaintiffs-Respondents,

v.

JACKSON TOWNSHIP BOARD OF
EDUCATION,

      Defendant-Appellant.

_____

Argued October 11, 2018 – Decided October 25, 2018

Before Judges Simonelli, Whipple and DeAlmeida.

On appeal from Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-1767-11.

Sebastian Ferrantell argued the cause for appellant (Montenegro, Thompson, Montenegro & Genz, PC, attorneys; Sebastian Ferrantell, of counsel and on the briefs).

Peter H. Wegener argued the cause for respondents (Bathgate, Wegener & Wolf, PC, attorneys; Peter H.

Wegener, of counsel and on the brief; Pamela M. Snyder, on the brief).

PER CURIAM

This inverse condemnation case is back before us following a remand ordered in Bartolf v. Jackson Township Board of Education, No. A-2417-14 (App. Div. Sept. 30, 2016) (slip op. at. 6-7). Defendant Jackson Township Board of Education appeals from the May 22, 2017 final judgment of inverse condemnation and order appointing commissioners entered in favor of plaintiffs Michael Bartolf,[1] Robert Bartolf, Charlotte Bartolf, William Bartolf and Leslie Bartolf. We affirm.

I.

Plaintiffs own three contiguous properties that front on East Veterans Highway in the Township of Jackson across the street from Jackson Liberty High School (the high school), which is owned by defendant. Plaintiffs' properties are traversed by a regulated, unnamed watercourse that flows southwesterly from East Veterans Highway between that roadway and the residential dwelling owned by the Dorothy E. Bartolf Trust and behind the homes owned by the other plaintiffs. This watercourse serves as a natural

_____

[1] Michael Bartolf is deceased. The Dorothy E. Bartolf Trust is his successor-in-interest in this matter.

A-4153-16T4

drainage for upland properties. As a result, plaintiffs' lower elevation properties had historically been subject to stormwater flowing from upland properties on its natural course towards its drainage point, the Toms River, some distance away.

The high school is located across the street from plaintiffs' properties and upland in the watercourse. According to plaintiffs, defendant changed the nature and extent of the natural flow of stormwater run-off coming from the high school property causing extensive and repeated flooding to, and erosion of, their properties. Plaintiffs claimed this condition began in 2005, when defendant neared completion of development of the high school property. Plaintiffs conceded the construction of a stormwater detention basin by the County of Ocean in 2010 on a portion of their properties helped reduce the severity of the flooding.

Plaintiffs filed a verified complaint, alleging that defendant's actions in directing stormwater runoff to their properties constituted a permanent and/or temporary governmental taking sufficient to give constitute inverse condemnation. Following a bench trial, the judge issued a written opinion, finding there was no permanent occupation or permanent physical invasions of plaintiffs' properties.

As to whether there was a temporary taking, the judge noted that "recent photographs" depicted "flowing and standing water on the properties, substantial erosion of certain areas and inundated vegetation on the site which [plaintiffs credibly] testified occurred between the commencement of the development of the high school property [and] construction of the [detention basin by the County]." The judge found, based on William Bartolf's credible testimony, that "although there would be some standing water on the family properties for perhaps twenty-four (24) hours after a major storm occurred, following development of the high school property, the stormwater run-off increased dramatically." The judge further noted that expert testimony established "an increase in the volume of stormwater flows unto [plaintiffs'] properties following a storm." The judge thus found it "probable" that for a period "following completion of the high school and [before] the construction of the [detention] basin, . . . [defendant's] action resulted in more severe flooding of, and erosion to, the plaintiffs' property."

However, the judge found plaintiffs did not definitively demonstrate that defendant caused the flooding. The judge determined the "increase [in stormwater run-off was] likely caused, as established by the uncontroverted testimony of [defendant's expert], by construction of the elevated driveway by

4

the [plaintiffs] which impedes the natural flow of water through their property." The judge further found defendant complied with applicable New Jersey Department of Environmental Protection (NJDEP) regulations, which do not regulate volume, and "plaintiffs [did not establish] by any credible engineering evidence that the increase in the total volume was the primary cause of the flooding."

Ultimately, the judge held that "[t]he facts presented in this case establish that any appropriation of the plaintiffs' land by [defendant] was temporary in nature," and "an inverse condemnation action cannot be based upon a temporary physical invasion by the State." Thus, the judge dismissed plaintiffs' complaint for failing to establish a valid claim for inverse condemnation.

Plaintiffs appealed.[2] For the first time on appeal, plaintiffs cited Arkansas Game & Fish Commission v. United States, 568 U.S. 23 (2012) to argue the judge applied the wrong standard to determine whether a temporary taking occurred and a temporary taking is compensable. Bartolf, slip op. at 5. We noted that:

> in Arkansas Game[] . . . Justice Ginsburg wrote for a
> nearly unanimous Court, that a "government-induced

_____

[2]  After plaintiffs appealed, the judge issued an amplified opinion pursuant to Rule 2:5-1(b), in which he substantially reiterated his prior findings.

A-4153-16T4

flooding temporary in duration gains no automatic exemption from Takings Clause inspection. When regulation or temporary physical invasion by government interferes with private property, our decisions recognize time is indeed a factor in determining the existence vel non of a compensable taking."

[Id. at 6 (footnote omitted) (quoting Arkansas Game, 568 U.S. at 38).]

Accordingly, we remanded for the judge to reconsider his ruling in light of Arkansas Game "to determine whether there was a temporary taking that rose to the level of an inverse condemnation." Id. at 6.[3]

In Arkansas Game, the Court established a four-part test for determining whether a temporary taking from government-induced flooding occurred: (1) the length of time of the alleged taking, (2) the degree to which the invasion is intended or is a foreseeable result of authorized government action, (3) the character of the land and the owner's expectations regarding the land's use, and (4) the severity of the government's interference with the land. 568 U.S. at 38-39.

On remand, as to the first factor, the judge found "the facts adduced at trial clearly established that for the two-to-three year period the [p]laintiffs'

_____

[3] We affirmed the judge's ruling that there was no permanent occupation or permanent physical invasion of plaintiffs' properties. Id. at 5.

lands were regularly flooded and the cause of this flooding was due to the construction of the [defendant's] new high school." Further, the judge "agree[d] with the plaintiffs' contention that the period of time of the physical invasion supports a finding of inverse condemnation."

As to the second factor, the judge found that "the defendant's basin as originally designed unreasonably impacted the plaintiffs' property and it was only after the [C]ounty stormwater facility was constructed that the flooding abated."

As to the third factor, the judge made more detailed factual findings. Specifically, the judge found that:

> [p]laintiffs used to plant corn, hay, and other crops in various locations throughout the land but were unable to continue doing so because the soil was so waterlogged it could not support the roots. The judge also found that where the [p]laintiffs' young children and grandchildren would be able to play within the backyards, they could not because of the degree of flooding and muddy conditions during the time in question. Plaintiffs used to cross the properties and go house-to-house simply by walking through the backyards but could not do so with the standing water and moving waters.

The judge concluded, "[b]ased on the uncontested testimony of [p]laintiffs . . . the characteristics of [p]laintiffs' land were substantially affected during this period of time."

7

As to the fourth factor, the judge again made more detailed factual findings:

> Plaintiffs testified during the times of flooding their properties were under about four (4) feet of standing water, even days after a storm passed. This amount of water blocked access to particular areas of the properties; deprived [p]laintiffs of ingress and egress to the backyards and back doors of the homes; and necessitated the building of a small footbridge for [p]laintiffs to use to get over the most affected areas of the property. Plaintiffs acknowledged in years past stormwater could stand on their properties, but [p]laintiffs clarified the water would percolate into the ground within a day or two, at most. In years past, before the construction, the stormwater would remain still before it seeped into the ground, but [p]laintiffs testified the water coursed through the backyards in widths up to 15 feet and carved out a 3-feet by 2-feet ditch.
>
> The continual presence of water saturated the soil and caused the soil to lose its integrity. Plaintiffs pointed to downed trees in their backyards—at least three trees total with a 25" circumference. Plaintiffs were unable to plant flowers or use their garden beds since the severity of the flooding increased during and after the construction of the high school. Plaintiffs' engineering expert . . . quantified these changes by calculating [that] the stormwater on [p]laintiffs' properties increased by 40% since the high school construction.

The judge thus found "[t]he evidence . . . supports a finding that the use of [p]laintiffs' lands were substantially affected during this period . . . ."

A-4153-16T4

Having determined that each of the four <u>Arkansas Game</u> factors were met, the judge concluded "there was a temporary taking of the plaintiffs' land" by defendant. The judge entered a final judgment of inverse condemnation and order appointing commissioners in favor of plaintiffs. This appeal followed.

Our review of a trial court's fact-finding in a non-jury case is limited. <u>Seidman v. Clifton Sav. Bank, S.L.A.</u>, 205 N.J. 150, 169 (2011). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence. Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility." <u>Ibid.</u> (quoting <u>Cesare v. Cesare</u>, 154 N.J. 394, 412 (1998)). We "should not disturb the factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant, and reasonably credible evidence as to offend the interests of justice." <u>Ibid.</u> However, we owe no deference to a trial court's interpretation of the law, and review issues of law de novo. <u>State v. Parker</u>, 212 N.J. 269, 278 (2012). "[F]or mixed questions of law and fact, we give deference under <u>Rova Farms [Resort, Inc. v. Investors Ins. Co. of Am.</u>, 65 N.J. 474, 483-84 (1974)] to the supported findings of the trial court, but review de novo the lower court's application of any legal rules to such factual findings." <u>State v.</u>

<u>Harris</u>, 181 N.J. 391, 416 (2004). Applying the above standards, we discern no reason to disturb the judge's ruling.

## II.

Defendant contends the judge erred by completely reversing his prior findings regarding causation and compliance with NJDEP regulations.[4] Regarding causation, defendant challenges the judge's finding on remand that, "the facts adduced at trial clearly established that for the two-to-three-year period the [p]laintiffs' lands were regularly flooded and the cause of this flooding was due to the construction of [defendant's] new high school." Defendant argues that this finding is inconsistent with the following passage from the judge's trial opinions:

> [T]he court finds that the plaintiffs' properties were subject to intermittent flooding prior to the construction of the high school facility. The 2002 photographs reveal that the ponding had occurred in approximately

---

[4] Defendant also contends the remand was impermissible, as we should not have permitted plaintiffs to present <u>Arkansas Game</u>. We conclude this contention is without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E). If defendant disagreed with our opinion, it should have moved for reconsideration or filed a petition for certification with our Supreme Court. In any event, there is nothing precluding this court from considering authority not cited by the parties. <u>See e.g.</u> <u>Regency Savings Bank, F.S.B. v. Morristown Mews, L.P.</u>, 363 N.J. Super. 363, 370 (App. Div. 2003); <u>State v. Dickerson</u>, 268 N.J. Super. 33, 37 (App. Div. 1993); <u>Caldwell v. Kline</u>, 232 N.J. Super. 406, 412 (App. Div. 1989).

the same location as it does now. Although the extent of this ponding is less than that which occurred prior to construction of the county drainage facility, it appears it is more extensive than it was prior to the construction of the high school. However, that increase is likely caused, as established by the uncontroverted testimony of [defendant's expert] Mr. Edwards, by construction of the elevated driveway by [plaintiffs] which impedes the natural flow of water through their property.

Defendant thus concludes it did not cause flooding, because there was intermittent flooding prior to construction of the high school, and, as the judge initially found, the cause of the increased flooding was plaintiffs' construction of an elevated driveway.

Defendant's "cause versus increase" contention is a semantics argument readily rejected by the judge at oral argument on remand, as evidenced by the following colloquy:

> [DEFENDANT'S COUNSEL]: But as [plaintiffs'] [c]ounsel indicated . . . their pleadings indicate the flooding was caused by the [high] school.
>
> THE COURT: No, no, it's a downstream property. It will flood from time-to-time. There's no question about it. The question is whether your client caused any, even on a temporary basis until that detention basin was built, whether there was, you know, whether you've done anything to cause [plaintiffs'] family injury and should, therefore, compensate them for that, for that period of time, and that's what we're here for.

Like the judge, we reject defendant's argument. First, any preexisting soil wetness on plaintiffs' properties following heavy rain, which would dissipate within twenty-four to forty-eight hours, was arguably not flooding at all, whereas, following construction of the high school, the properties were continuously saturated for months on end, and water was, in places, four-feet deep. Plaintiffs also testified that areas of the properties that had never previously flooded did so following construction of the high school.

Second, plaintiffs alleged in their complaint that "[a]s a result of the [d]efendant's drainage system, which includes the detention/retention basin, water and mud coursed through and onto [p]laintiffs' properties, causing flooding and other problems on repeated occasions." Flooding was, thus, but one "problem" plaintiffs contended resulted from the water and mud coursing through and onto their properties. If this coursing water and mud uprooted trees, eroded the soil, prevented the growing of crops, and prevented ingress and egress, among other associated problems, as the record confirms, it was a taking regardless of whether flooding was caused or increased. We note that in Arkansas Game, the plaintiff's land was also historically subject to flooding. 568 U.S. at 39. However, because the historical flooding was not comparable in terms of the severity or damage caused, the Federal Circuit on remand

12

nevertheless upheld the trial court's finding of "causation."  Arkansas Game &

Fish Com'n v. United States, 736 F.3d 1364, 1372-73 (Fed. Cir. 2013).

Regarding the impact of the elevated driveway, the judge's initial reliance thereon as the true cause of the flooding was erroneous.  As plaintiffs' counsel stated at oral argument on the remand, the elevated driveway is a "red herring," "the elevated driveway was not constructed until the County basin was constructed."

The issue is obfuscated by the presence of two driveways bisecting the properties. The first driveway had appropriately sized pipes underneath to allow for the passage of water and was never at issue.  Conversely, defendant's expert blamed the flooding entirely on the second driveway, which he said acted like "a dam on a regulated watercourse," as the driveway was elevated and the pipes underneath were inadequately small.  Defendant's expert did not visit the site until October 17, 2012, more than six years after construction of the high school commenced and approximately two years after the County constructed the detention basin and the driveway was elevated.  The expert reviewed the County's site plans, but stated the plans "[we]re noticeably absent of any information much downstream of [the] first driveway."  Ultimately, the expert

admitted he "ha[d] no record as to who put that pipe in, those pipes [underneath the elevated driveway]," or who elevated the driveway.

However, the record shows that the County, not plaintiffs, elevated the second driveway in 2010, when the County constructed the detention basin. Prior thereto, the second driveway was approximately four feet lower and was "flat" and "level." Though discussion of the two driveways was convoluted at trial (and at times difficult to decipher in the transcripts), William Bartolf's testimony confirmed that the problematic second driveway was not elevated until 2010, and plaintiffs did not elevate it.

Thus, the judge was incorrect to find that plaintiffs elevated the driveway, and thus caused the flooding. The absence of such finding in the remand opinion, is thus, not reversible error, as it was a correction of a finding manifestly unsupported by and inconsistent with the facts adduced at trial. To the (unlikely) extent that the elevated driveway was the cause of the flooding and associated problems on the properties, and the County elevated the driveway, defendant should have addressed this by way of a third-party claim against the County.

Defendant also argues its actions could not be deemed unreasonable where the judge previously found it complied with NJDEP regulations and plaintiffs

failed to establish causation with engineering evidence. Specifically, defendant asks us to contrast the judge's finding on remand that "the [d]efendant's basin as originally designed unreasonably impacted the [p]laintiffs' property" with his prior finding that "the [defendant] has complied with all applicable storm water regulations . . . volume of water is not regulated by the NJDEP . . . and, more importantly the [p]laintiffs have not established by any credible engineering evidence that the increase in the total volume was the primary cause of the flooding."

Defendant's argument — that compliance with NJDEP regulations bars its action from being a taking — is legally and factually incorrect. First, the entire concept of "regulatory taking," under which a taking occurs where a government regulation deprives a property owner of the economic benefit of its property, necessarily entails the occurrence of a compensable taking notwithstanding the "taker's" compliance with regulations. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992); Mansoldo v. State, 187 N.J. 50 (2006).

Second, even restricting defendant's argument to physical takings, it is nevertheless still incorrect. The second Arkansas Game factor, "the degree to which the invasion is intended or is the foreseeable result of authorized government action," clearly contemplates that a taking may occur pursuant to,

and not in conflict with, government authorization of some kind. 568 U.S. at 39 (flooding caused by Army Corps of Engineers release of water, a deviation permitted by Corps' Water Control Manual for dam); see also Loretto, 458 U.S. at 437-41 (cable TV company must compensate building owner for equipment installed pursuant to state law).

The record amply supports the judge's finding on remand that the flooding and associated problems on plaintiffs' properties was a foreseeable and unreasonable result of defendant's action. Defendant's own Stormwater Management Report documents that the volume discharge increased dramatically following construction of the high school by forty-two percent for a one-year storm, over fifty percent for two-year and ten-year storms, and eighty percent for a one-hundred-year storm. Defendant's expert acknowledged this increase in volume; that per NJDEP regulations, post-construction run-off is supposed to be "reduced;" and additional volume would lead to more frequent flooding of the properties. However, the expert contended that because NJDEP regulations only regulated the flow rate, not volume, of stormwater run-off, defendant nevertheless complied with NJDEP regulations.

Defendant was also able to avoid analysis of plaintiffs' properties by way of technicality. Defendant's expert testified that NJDEP requires mapping 500

16

feet upstream and downstream of a project that impacts a watercourse. Technically, the high school project did not "impact the watercourse" because the defined watercourse ends at a neighboring property and the high school's drainage system only reached the watercourse through that property.

Given the above, the judge's finding on remand that defendant's actions "unreasonably impacted the plaintiffs' property," notwithstanding compliance with NJDEP regulations, was not manifestly unsupported by or inconsistent with the evidence. Under these circumstances, it can hardly be said that compliance with NJDEP regulations was reasonable per se.

The second portion of the alleged inconsistency − the judge's initial finding that plaintiffs failed to "establish by any credible engineering evidence that the increase in the total volume was the primary cause of the flooding," as compared to the finding on remand that "the cause of the flooding was due to the construction of [defendant]'s new high school" − also provides no grounds for disturbing the judge's decision on remand. Any inconsistency is a permissible deviation in light of the judge's application of the correct legal standard in Arkansas Game on remand.

At trial, plaintiffs provided sufficient evidence for the judge to find it "probable" that "[defendant's] action resulted in more severe flooding of, and

erosion to, the plaintiffs' properties." Plaintiffs testified as to the severity of the flooding and the drastic alteration to the character of their properties. Further, plaintiffs' expert provided an engineer's perspective.

Plaintiffs' expert testified that the flooding and associated problems were caused by the additional volume of water inundating the properties, and he knew that because of the timing of events, the volume of water came from the high school, not other upland properties. He based his conclusion on a review of historical United States Geographical Survey and NJDEP maps, photographs of the property, interviews with the plaintiffs, site visits, and an analysis of wetlands vegetation growth. He also based his conclusion on the quantification, from defendant's Stormwater Management Report, that defendant's drainage system inundated plaintiffs' properties with a drastically increased volume of water. Recall that defendant's expert conceded there was additional volume and the likelihood that additional volume would lead to more frequent flooding of the properties.

The judge referenced all of the above credible evidence in his trial and remand opinions. The judge's determination on remand there was sufficient basis to find causation, when viewing both that concept and the evidence through the Arkansas Game lens, is precisely the determination we asked the judge to

make. The shift in the judge's conclusion from "probable" to legally sufficient is supported by the evidence and should not be disturbed, especially as the evidence was largely testimonial and involved questions of credibility. Seidman, 205 N.J. at 169.

III.

Defendant attempts to distinguish this case from Arkansas Game to argue a taking did not occur. Defendant first argues that in Arkansas Game, the government intentionally caused flooding by releasing water from a dam, whereas here, defendant could not cause flooding because "it cannot cause it to rain." Defendant next argues that plaintiffs have not and could not demonstrate investment-backed expectations because the property was residential. We reject both arguments.

Defendant's first argument rests on an overly simplistic view of causation. Rain is not a sufficient intervening cause to break the causal chain and extinguish defendant's liability. The second Arkansas Game factor, "the degree to which the invasion is intended or is the foreseeable result of authorized government action," 568 U.S. at 39, adopts "foreseeability" as the proximate cause inquiry, in line with past holdings that "ordinary principles of proximate cause govern the causation inquiry for takings claims." Tahoe-Sierra

19

Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 345 (2002) (citations omitted); Cary v. United States, 552 F.3d 1373, 1377 (Fed. Cir. 2009) (inverse condemnation plaintiff must show government intended to invade property interest or invasion was a "direct, natural or probable result of an authorized activity"). Plaintiffs' injuries were certainly reasonably foreseeable by defendant.

Defendant is unable to skirt liability under this analysis by blaming plaintiffs' injury on rain. It is doctrinal that foreseeable and normal intervening causes do not break the causal chain and relieve liability. Cruz-Mendez v. ISU/Insurance Services of San Francisco, 156 N.J. 556, 575 (1999) (citing Rappaport v. Nichols, 31 N.J. 188, 203, (1959)). That rain will flow into and out of a stormwater drainage system is foreseeable and normal. Rain is, thus, not an intervening cause sufficient to relieve an actor of liability.

The Federal Circuit addressed the same argument on remand in Arkansas Game. 736 F.3d at 1370-73. There, the government argued that rainfall and other factors, such as run-off from other sources, caused the flooding. Id. at 1371. The court concluded the "evidence support[ed] the trial court's findings that the [release of water] caused a substantial increase in the periods of . . .

flooding . . . and that the flooding caused widespread damage . . . ." Id. at 1372 (emphasis added). We reach the same conclusion here.

Defendant next argues that plaintiffs "introduced no testimony either by lay witnesses or experts regarding [any] 'investment backed expectations.' . . . This property is residential. Although there was testimony of an alleged inability to hit golf balls or plant flowers, there was no testimony regarding alleged financial impact as in [Arkansas Game]."

Defendant does not have a correct understanding of "reasonable investment-backed expectations." The third Arkansas Game factor measures "the character of the land at issue and the owner's 'reasonable investment-backed expectations' regarding the land's use." 568 U.S. at 39 (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001)). On remand here, the judge provided many examples of the change in the character of plaintiffs' land, which were well-supported by the record and which went far beyond defendant's sarcastic characterization of an "inability to hit golf balls or plant flowers."

The judge did not address whether the change in the character of the land distorted plaintiffs' investment-backed expectations; however, a review of the record makes it clear it did. A property owner commonly lacks reasonable investment-backed expectations where the taking, for example, a restrictive

21

regulation, is in place prior to acquisition of the property; in that instance, the property owner could not have expected to possess the property free of the governmental interference. Palazzolo, 533 U.S. at 634-35 (O'Connor, J., concurring). The record shows that Michael Bartolf purchased the properties sometime before 1950, long before the governmental taking in this case. Defendant's predecessor-in-interest operated a quarry on the high school land, and the record shows that water from upland properties would flow into, and remain in, the quarry. Thus, though plaintiffs' property was residential in nature, their reasonable investment-backed expectation was that the status quo would be maintained. Defendant, by directing a drastic increase in stormwater onto plaintiffs' properties, unreasonably interfered with their investment-backed expectations, further substantiating plaintiffs' claim that defendant effectuated a taking.

A trial judge must comply with the remand order of an appellate court. Tomaino v. Burman, 364 N.J. Super. 224, 232 (App. Div. 2003). A "broad and open-ended" remand order will not, however, preclude the trial judge from considering alternative legal theories or claims or crafting alternative remedies. Bubis v. Kassin, 353 N.J. Super. 415, 424, 427-28 (App. Div. 2002). We are satisfied that on remand, the judge did exactly as we instructed and reconsidered

the matter through the <u>Arkansas Game</u> lens to determine whether there was a temporary taking that rose to the level of an inverse condemnation. Guided by the proper standard, the judge's findings on remand that defendant caused flooding on plaintiffs' properties and committed a temporary taking that rose to the level of an inverse condemnation are amply supported by the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4153-16T4