# United States Court of Appeals
## For the Eighth Circuit

_____

## No. 23-1939

_____

Cleo Watkins; Pyles Family Farms LLC; Victor Hutcheson, originally named as Victor Hutcherson; Alvella Hutcheson, originally named as Alvella Hutcherson; Helen Knight, as Trustee of Helen Mae Knight Trust, also known as Helen Mae Knight; Michael Watkins; Betty Watkins; George Carney; Brenda Watkins

*Plaintiffs - Appellees*

v.

Lawrence County, Arkansas; John Thomison, in his official capacity as County Judge of Lawrence County Arkansas; William Powell, In his official capacity as a member of the Lawrence County Quorum Court; Donald Richey, In his official capacity as a member of the Lawrence County Quorum Court; Lloyd Clark, In his official capacity as a member of the Lawrence County Quorum Court; Heath Davis, In his official capacity as a member of the Lawrence County Quorum Court; Ernest Briner, In his official capacity as a member of the Lawrence County Quorum Court; Ronald Ingram, In his official capacity as a member of the Lawrence County Quorum Court; Tracy Moore; Kenny Jones, In his official capacity as a member of the Lawrence County Quorum Court; Alex Latham, In his official capacity as a member of the Lawrence County Quorum Court

*Defendants - Appellants*

_____

## No. 23-2110

_____

Cleo Watkins; Pyles Family Farms LLC; Victor Hutcheson, originally named as Victor Hutcherson; Alvella Hutcheson, originally named as Alvella Hutcherson;

Helen Knight, as Trustee of Helen Mae Knight Trust, also known as Helen Mae Knight; Michael Watkins; Betty Watkins; George Carney; Brenda Watkins

*Plaintiffs - Appellants*

v.

Lawrence County, Arkansas; John Thomison, in his official capacity as County Judge of Lawrence County Arkansas; William Powell, In his official capacity as a member of the Lawrence County Quorum Court; Donald Richey, In his official capacity as a member of the Lawrence County Quorum Court; Lloyd Clark, In his official capacity as a member of the Lawrence County Quorum Court; Heath Davis, In his official capacity as a member of the Lawrence County Quorum Court; Ernest Briner, In his official capacity as a member of the Lawrence County Quorum Court; Ronald Ingram, In his official capacity as a member of the Lawrence County Quorum Court; Tracy Moore; Kenny Jones, In his official capacity as a member of the Lawrence County Quorum Court; Alex Latham, In his official capacity as a member of the Lawrence County Quorum Court

*Defendants - Appellees*
_____

Appeals from United States District Court
for the Eastern District of Arkansas - Northern
_____

Submitted: April 9, 2024
Filed: May 28, 2024
_____

Before BENTON, ARNOLD, and STRAS, Circuit Judges.
_____

ARNOLD, Circuit Judge.

After a group of Arkansas landowners began to suspect that a bridge constructed and managed by Lawrence County had caused their farms to flood, they sued the county, complaining that it had unlawfully taken their properties without providing just compensation, in violation of the United States Constitution and the Arkansas Constitution. *See* U.S. Const. amend. V; Ark. Const. art. II, § 22; *see also Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 27 (2012). A jury awarded the landowners almost $350,000, and the district court upheld the award, but it rejected the landowners' request to order the county to tear down the bridge. Both sides appeal. We affirm the district court's determination that the record supports the jury's award, but we remand for the court to take another look at the landowners' request for injunctive relief.

The landowners' farms are located in Northeast Arkansas near the Cache River, which flows from north to south. Near their farms, the West Cache River Slough, or "Slough," splits from the Cache River and flows nearly parallel to the Cache until the two meet again about nine miles downstream. Just downstream from where the Slough splits from the Cache, a bridge along a county road goes over the Slough. For many years the bridge was a wooden structure, but in 1997 the county replaced it with a crossing that is essentially a dirt embankment with five culverts. The landowners do not believe that the culvert bridge permits water to flow through the Slough as it should; instead, they say, it acts as a dam, forcing excessive water into the Cache River that spills onto their farms.

At trial, each of the landowners or a representative familiar with the landowners' farms identified their farms on a map and testified that their farms had experienced more flooding since the county replaced the wooden bridge with the culvert bridge. In general, the landowners explained that it now takes less rain to flood their properties, and when their properties flood, the water remains longer than it had before. They noted that the increased flooding has adversely affected their crops. For example, one plaintiff testified that, from 1958 until the county installed

the culvert bridge, one of his tracts never missed a crop, though beginning around 2000, crop failures had become frequent. Another testified that from 1973 until 1997, when her father farmed the land, he missed only one crop because of flooding. But from 2012 until the trial in November 2021, the farm missed a crop typically every other year, and she couldn't recall the last time the farm had produced in three consecutive years.

The landowners also presented expert testimony from a hydraulic engineer named Marc Johnson to support their contentions. Johnson opined that the bridge had indeed caused the landowners' properties to flood. He devised a model showing that increased flooding from the bridge began to occur on the relevant farms when flow from the Cache River was between 2,000 and 5,500 cubic feet per second. He could tell when the River experienced these flows because a nearby gauge recorded the information. Once the flow exceeded 5,500 cfs, Johnson explained, the relevant farms would have flooded even if the wooden bridge was still in place. He concluded that, from 2008 to 2020, there were 862 days when the River's flow was between 2,000 and 5,500 cfs.

Johnson illustrated his opinions for the jury using as an example an actual flood that had occurred. Using the same map that the landowners had used to identify their farms, Johnson explained how increased flooding from the culvert bridge had affected each farm in terms of the duration the water sat on the farm and the elevations and depths that the waters reached. He concluded that for eighteen of the twenty-seven tracts at issue, the bridge had resulted in increased flooding. As for the remaining nine tracts, six lay outside of the model's reach and three saw no increased flooding at all.

The landowners' damages expert, Jim Grisham, testified that he has managed farms in the area for several years and explained how he calculated the farms' rental values using the value of the crops planted on them. Grisham did not have records

from landowners showing what crops, if any, each farm actually produced in a given year. But he did have access to government documents known as 578 Forms that he said farmers usually sign after planting their crops. Those forms contain three relevant categories of information. First, they reveal how many acres a farmer planted. Second, they show the kind of crop, such as rice or soybeans, a farmer planted on those acres. Third, they note the percentage of the crop that the landowner would receive and the percentage that the tenant farmer would receive. So, for example, plaintiff Brenda Watkins's 578 Form from 2013 shows that about 252 acres were planted on her farms, 212 of which were dedicated to rice and 40 of which were dedicated to soybeans. They also show that she would receive 25% of the crops grown on the farm while the tenant farmer would receive 75%.

But that information got Grisham only so far. He still needed to know how many bushels those planted acres would produce and the price for which those bushels could be sold. To obtain that information, Grisham considered the yield and prices he received from four nearby farms that he managed with similar soils. He had records known as settlement sheets that allowed him to calculate the average yield of those farms and the average prices that each crop received. So by comparing to those farms, Grisham could estimate how many bushels the landowners' farms should've produced and the price those bushels would've sold for. Returning to the example involving Brenda Watkins, Grisham estimated that she should've expected to receive about $58,672.10 in 2013, which, according to Grisham, represented the estimated rental value of her farm that year. Grisham performed similar calculations for each landowner for each year they sought a recovery.

In addition to providing annual rental values for each plaintiffs' farms, Grisham calculated their average daily rental values by dividing their annual values by 365. Grisham multiplied this daily rental value by the number of flood days in a given year to generate a figure showing how much rent the county would have to pay, as the landowners' attorney put it, to park its water on the landowner's properties. Returning

yet again to our example, recall that Grisham estimated that the rental value of Brenda Watkins's farms in 2013 was $58,672.10. That's an average daily rate of about $160.75. Johnson estimated that the bridge caused eighty flood days that year, meaning that the county should've paid about $12,860 to Brenda Watkins for occupying her farms for eighty days that year. Though Grisham provided these daily figures to the jury, he testified that he believed the annual rental value was the more appropriate figure for the jury to award since "[y]ou don't rent land [to farm] by the day. You rent it by the year." So the landowners asked the jury to award the sum of those annual values for each landowner.

On cross examination, Grisham conceded that his calculations weren't based on how much each landowner actually earned during any given year. He acknowledged that a landowner could have earned more during the year selling crops than the landowners requested the jury to award them, but he also pointed out that they could have made much less or even nothing because of flooding.

At the close of the landowners' case, the county moved for judgment as a matter of law, arguing that the landowners had failed to offer sufficient evidence of damages since Grisham didn't calculate the value of crops actually lost. The landowners responded that in cases involving temporary takings like the one here, the proper measure of damages is the fair market value of land temporarily taken. The court took the motion under advisement.

The jury determined that the landowners had proven their takings claims with respect to each tract of land at issue and awarded damages. But the jury's award fell far short of what the landowners had requested. So, for example, the landowners requested that the jury award plaintiff Pyles Family Farms LLC $399,872.14, which represents the sum of the annual rental values that Grisham calculated (plus a little interest). Grisham calculated the daily rental amount times the number of flood days to be $65,429.20. Yet the jury awarded Pyles only $47,984.66. The jury awarded

plaintiffs Victor and Alvella Hutcheson only $16,332.03 even though the sum of their annual values was $136,100.26 and the sum of their daily rental values times the number of flood days was $22,633.71. No one is sure how the jury settled on the figures that it awarded, but it is indisputable that the jury didn't simply award the plaintiffs the money they requested, or even the smaller, daily figure that Grisham had calculated.

The county renewed its motion for judgment as a matter of law after the trial. It argued that the landowners did not present testimony "as to whether the rental value of their properties had actually been affected in any given year," and "[s]ince rental value of a farm is determined as a percentage of crop yield, it is something that can be measured tangibly by comparing actual yield to expected yield," evidence of which the landowners didn't present. That rendered "any reduction in rental value . . . speculative." The court denied the county's renewed motion, holding that the evidence was sufficient for the jury to make a fair and reasonable approximation of damages.

We review de novo the court's decision to deny the motion, resolving factual conflicts in the landowners' favor and giving them the benefit of all reasonable inferences. *See Stults v. Am. Pop Corn Co.*, 815 F.3d 409, 418 (8th Cir. 2016). A jury verdict should not be overturned lightly "because of the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused." *See Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800, 805 (8th Cir. 2017). But "when the record contains no proof beyond speculation to support the verdict, then judgment as a matter of law is appropriate." *Hinz v. Neuroscience, Inc.*, 538 F.3d 979, 984 (8th Cir. 2008).

In takings cases such as the one here, courts have emphasized "that the quantum of damages be shown to a reasonable approximation." *See Ark. Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1379 (Fed. Cir. 2013). That standard

is simple to state in the abstract but somewhat difficult to apply in practice, and it takes a fair amount of judgment to determine whether the evidence shows damages to a reasonable approximation. Courts have explained that "absolute exactness or mathematical precision" is not required, though a mere guess won't do. *See id.* Similarly, for damages to be reasonably approximate, they "may not be based wholly on speculation, and may be estimated with a fair degree of accuracy." *See id.*

Though we think the case is a close one, we agree with the district court that the evidence permitted the jury to make a fair and reasonable approximation of the damages. We agree with the county that the landowners could have proven damages by providing evidence of the amount of crops they expected to grow versus the amount of crops they actually grew in a given year due to increased flooding. But while actual crop loss was one theory of recovery that the landowners might have pursued, *see Ideker Farms, Inc. v. United States*, 71 F.4th 964, 987–88 (Fed. Cir. 2023), they were not obliged to do so.

Instead the landowners sought to recover the "usual measure of just compensation" for temporary takings—the fair rental value of the property during the period of the taking. *See Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1581 (Fed. Cir. 1990). As other courts have observed, the government's temporary taking of property is akin to it taking a leasehold interest in property for a set period. *See id.* at 1580. A plaintiff can recover from the government the rental value of the property during that period.

That's precisely what the landowners introduced evidence of here. Grisham testified that the rental value of the farms was determined by the share of crops the landowner could expect to receive under normal circumstances, which he then estimated. Though he had to estimate the yield and prices that the landowners here could have expected based on a comparison to similar farms that he managed, we

think his estimates were reasonable enough and were far from being speculative guesses generated out of the blue.

It is true that the landowners asked the jury to award the full annual rental values of the farms even though the county flooded them only part of the year. While that might sound questionable at first, we think the request makes sense given that in years when flooding destroyed the farms' crops, the landowner would've received no rent. Besides, a factfinder need not award the amount of damages that a party requests. *See, e.g.*, *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 833 (Fed. Cir. 2010). The landowners also presented evidence of the average daily rental value of their farms and the number of days that the county's bridge caused those farms to flood. We think it would have been reasonable for the jury to compensate the landowners for each day that the county occupied their properties with flood water, which was based on evidence that the jury had before it. In short, we agree with the district court that the evidence permitted the jury to make a fair and reasonable approximation of damages even though, as the county says, no landowner specified the years in which he lost crops.

Relatedly, the county maintains that flooding during certain times of the year shouldn't play into damages because if flooding occurred after a crop was gathered and sold, then it wouldn't affect crop losses. But the landowners sought the lost rental value of their farms, and a daily average rental value multiplied by the number of additional flood days that the bridge caused is a reasonable way to estimate damages. Also, Grisham specifically testified that flooding at any time during the year adversely affected a farm's output, including times when flooding occurs post-harvest, because it prevents farmers from preparing their fields for the following year. The jury was free to consider the county's argument about flood timing and Grisham's views on the subject and draw its own conclusion.

The county also takes issue with an additional $20,000 in damages that the jury awarded one plaintiff to reimburse him for costs of repairing his property. Although there is an argument that this type of recovery is unavailable in a takings case, the county does not make it. The court instructed the jury that it could award "the reasonable expense of necessary repairs to any property which was damaged" in addition to awards for lost rental value. The county seems to take issue with the award on the ground that the work could have been necessitated by any flood and not just the additional flooding caused by the bridge. Based on this plaintiff's testimony, though, we think the jury could reasonably attribute the repairs to the additional flooding that the bridge caused, and so we do not disturb this portion of the jury award.

The county next takes aim at Grisham's use of the 578 Forms' farm numbers. It notes that, from his testimony, those forms are identified by number, and those numbers stem from a farm's ownership, not location, so there's no way to know "where any of the FSA farm numbers are" on the map that Johnson and the landowners used to identified the relevant farms. In short, it says, "[t]here is no correlation at all between FSA farm numbers and the parcel numbers used by Marc Johnson in his flooding map," meaning the evidence was insufficient to support the jury's verdict.

Assuming that there is some mismatch between the 578 Forms' farm numbers and the parcel numbers that the landowners and Johnson identified, the county has waived any challenge to it. The county's motion for judgment as a matter of law centered on the landowners' failure to offer evidence of actual crop losses in any given year, and it raised no mismatch argument. Nor did the district court address the matter in its order denying judgment as a matter of law, "most likely because it did not think that it was being asked to." *See Moore v. Am. Family Mut. Ins. Co.*, 576 F.3d 781, 785 (8th Cir. 2009). By not including the issue in its motion for judgment as a matter of law, the county has failed to preserve it for our review. *See Ludlow v.*

-10-

*BNSF Ry. Co.*, 788 F.3d 794, 800 (8th Cir. 2015); *see also Burckhard v. BNSF Ry. Co.*, 837 F.3d 848, 855 (8th Cir. 2016) (per curiam). Besides, the landowners told the jury how large their farms were and even introduced deeds to support their assertions. A jury could have compared the landowners' proof with the acreage on the 578 Forms and adjusted its award accordingly.

Finally, the county emphasizes that Johnson concluded from his model that only eighteen of the twenty-seven tracts at issue saw additional flooding from the culvert bridge. But for the six tracts that lay north of a highway and outside the reach of the model, Johnson said that he believed those properties would have flooded too because of the culvert bridge. And the landowners themselves testified that these properties flooded more because of the bridge. So we think the evidence was sufficient for the jury to conclude that the culvert bridge caused these six tracts to flood.

The remaining three tracts present a closer question. All three belonged to a plaintiff named Betty Watkins, and Johnson's model showed that the bridge did not result in increased flooding on these tracts. The landowners may have been prepared to drop their claims relating to these tracts. Betty Watkins's representative affirmed on direct examination that one of these tracts was no longer at issue in the lawsuit, while Johnson testified on direct examination that he understood all three properties were no longer part of the case. The verdict forms nonetheless asked the jury whether Betty Watkins had proven a taking with respect to these three tracts and another tract of hers that Johnson determined had suffered increased flooding from the culvert bridge. The jury found that she had and awarded her $50,826.24.

We hold that the county has waived any challenge to the verdict form's inclusion of these three tracts. During a conference on the jury instructions and verdict forms, counsel for the landowners mentioned that the forms might need to be revised to omit reference to these tracts. The court instructed the parties, including

-11-

both defense counsel, to check on that matter before the next conference. At that conference the court mentioned that the evidence might have eliminated claims related to some parcels from the suit but explained that "[w]e didn't drop anything from what our initial set was." After speaking with counsel for the landowners, the court asked defense counsel if they "agree[d] with what is represented in my verdict form with respect to the parcels at issue," and defense counsel responded, "We agree, Your Honor. And we have no objection to the verdict form." By affirmatively stating that it had no objection to the verdict form, despite being specifically alerted to a possible difficulty, we believe the county has waived its challenge. In *United States v. Morrissey*, 895 F.3d 541, 551 (8th Cir. 2018), we deemed a challenge to a court's jury instruction waived when the court told the challenging party what it proposed to say and the challenging party responded, "I have no objection to that." Similarly, in *United States v. Booker*, 576 F.3d 506, 510–11 (8th Cir. 2009), we held it was "a clear case of waiver" when a party challenging a jury instruction on appeal told the district court that it had no objection to the court's proposed instruction. So too here.

We turn now to the landowners' cross appeal. They say that the district court should have granted their request for injunctive relief and ordered the county to remove the culvert bridge. "We review the grant of a permanent injunction for abuse of discretion." *Miller v. Thurston*, 967 F.3d 727, 735 (8th Cir. 2020). We've explained that parties seeking permanent injunctive relief must show actual success on the merits, and if they do, then the court must also consider the threat of irreparable harm to the moving parties, the harms an injunction might inflict on other parties, and the public interest. *See id.* at 735–36.

Rather than focusing on these considerations, the district court instead turned to the law of standing, even though the landowners' standing wasn't at issue. In doing so, the court ventured into areas that have little bearing on a proper evaluation of the request. For example, the court carefully examined the shortcomings in the landowners' takings claims, even stating that the county's arguments about these

shortcomings "resonate with the Court" and "form the basis in part of the Court's uncertainty regarding plaintiffs' ability to establish damages moving forward." Not only does the court's discussion raise questions about whether it made factual findings that conflict with the jury's findings, *see Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 344 (8th Cir. 2018), but it's hard to see the relevance of the court's discussion given that the landowners obtained actual success on the merits, and nothing in the record suggests that bridge-induced flooding would stop. Though the court briefly touched on matters that are relevant, such as the landowners' delay in seeking injunctive relief and the fact that other people in the area use the bridge, we hold that the court's heavy reliance on the law of standing makes it unclear whether irrelevant considerations materially affected its equitable discretion. So we vacate the court's order denying injunctive relief and remand for the court to give the landowners' request a more focused consideration.

Affirmed in part; vacated and remanded in part.

_____